**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

| | |
|---|---|
| GLADYS WINSHIP, | Civil No. 07-171 (JRT/FLN) |
| Plaintiff, | **MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| DAKOTA COUNTY, | |
| Defendant. | |

Richard T. Wylie, **ATTORNEY AT LAW**, 701 Fourth Avenue South, Suite 500, Minneapolis, MN 55415, for plaintiff.

Andrea G. White, Assistant County Attorney, **DAKOTA COUNTY ATTORNEY'S OFFICE**, 1560 Highway 55, Hastings, MN 55033, for defendant.

Plaintiff Gladys Winship brought this action against her former employer, Dakota County, alleging that Dakota County interfered with her rights under the Family Medical Leave Act ("FMLA") by, among other things, giving her negative performance reviews, formally reprimanding her for health-related absences, and suspending her for one day. This case is now before the Court on Dakota County's motion for summary judgment. For the reasons given below, the Court grants in part and denies in part Dakota County's motion.

**BACKGROUND**

Winship worked as a Collections Specialist for Dakota County from 1998 until she was placed on FMLA and disability leave in April 2006. Throughout much of her

employment at Dakota County, Winship experienced a variety of health-related issues. In February 2004, Winship developed pneumonia and staph infection after undergoing an emergency appendectomy. She applied for and was granted FMLA leave, which she used intermittently from February 18, 2004 until June 10, 2004. In July 2004, shortly after Winship returned from her FMLA leave, she received the highest possible rating in her performance review for the period from June 2003 until June 2004.

On October 6, 2004, Winship's immediate supervisor, Alberta Cylkowski, sent Winship a written memorandum regarding her work attendance. (Cylkowski Aff. Ex. 11.) Cylkowski notified Winship that she had depleted her accrued "flex time" for health-related absences, and that she would therefore have no flex time available for use in an emergency situation. Cylkowski also stated that, because Winship's flex time was depleted, any absences in the near future would be without pay. Cylkowski informed Winship that the amount of unplanned use of flex time was jeopardizing her job performance. The memo noted various options for Winship, including asking her doctor whether she should have reduced work hours, requesting part-time work, or requesting a leave of absence. If these options were not acceptable, Cylkowski stated that Winship should obtain a doctor's note for each day of unplanned flex time. Winship testified in deposition that Cylkowski's memo created significant stress because she could not control her continuing health problems.

Winship continued to have work attendance issues in the following months, though she did not request FMLA leave during this time. In May 2005, Dakota County asked Winship to provide her treating physician with a letter requesting a written report

on her ability to perform essential functions as a Collections Specialist. The letter noted that Winship had missed 191 hours in unplanned absences from January to April 2005. Winship refused to provide the letter to her physician.

On May 18, 2005, Dakota County's Deputy Employee Relations Director, Nancy Hohbach, sent Winship a memorandum stating that her unexcused absences had exceeded an acceptable level. The memo noted that Winship had refused to provide the letter to her physician, and stated that if she did not comply with that request Dakota County would take disciplinary action for any further unexcused absences. After receiving Hohbach's memo, Winship agreed to take the letter to her doctor and to sign a medical information release.

Winship's physician responded to Dakota County by letter dated May 26, 2005. The physician stated that Winship was fully capable of performing all of the essential functions of her job as a Collections Specialist on a full time basis without reasonable accommodations. (Hohbach Aff. Ex. 15.) The letter noted that Winship had experienced a variety of medical complications following her appendectomy, including persistent gastrointestinal and respiratory infections. The physician stated that Winship was also experiencing stress as a result of the infections and issues in the workplace.

In August 2005, Winship received a performance review for the period of June 2004 to June 2005. Winship received an overall rating of two on a scale of one to three, with level one being the highest rating and level three being the lowest. The review was largely positive. However, the review stated that Winship's "unreliable attendance has created a problem with coverage and trust from myself as well as fellow employees."

(Hohbach Aff. Ex. 16 at 5.)  Winship received a merit increase and a raise as a result of the performance review.

Winship had always received positive performance reviews, and the August 2005 review was upsetting to her.  According to Winship, none of her co-workers had ever complained about her attendance or said that they did not trust her.  She alleges that Cylkowski knew that her absences were caused by her appendectomy and the resulting complications.  According to Winship, she approached Phillip Dalseth, her second tier manager, to discuss the review.  Dalseth confirmed that her absences following surgery were part of the reason for the lower rating.  Winship alleges she told Dalseth that this was illegal, and Dalseth yelled "That's the way it is, maybe you should work part time." (Winship Decl. ¶ 8.)

In November 2005, Winship was hospitalized for gastrointestinal problems resulting from an ischemia, or a stroke in part of the colon, as well as colitis, an incurable but treatable inflammation of the colon.  Winship was hospitalized for five days.  She called Cylkowski and told her she would be out of work for about 10 days.  Winship did not request FMLA leave for this absence.

Winship suffered severe effects from the colitis – including cramps, diarrhea, and physical weakness – when she returned to work, resulting in significant absences. Winship alleges that she often had to run to the bathroom while at work.  She also alleges that during this time she brought in doctor's notes regarding her medical issues, and explained her symptoms to Cylkowski. Winship was absent from work 132.75 hours out of a total of 320 work hours in January and February 2006.  Of these, 44.75 hours were

unplanned flex hours, and 88 were unpaid time because plaintiff had depleted her available flex time hours. Winship did not request any FMLA leave for the absences during this time.

On February 27, 2006, Cylkowski and Dalseth issued a written reprimand to Winship for excessive absenteeism without prior approval in January and February 2006. The reprimand noted that Winship had worked only 58% of her full time work schedule in those two months, and stated that unless she followed the required procedures for requesting a leave of absence and received approval, the absences would be considered unexcused. The reprimand stated "[a]ny absence without prior approval is considered unauthorized and will result in progressive disciplinary action. Failure to comply with this directive will result in termination of employment." (Hohbach Aff., Ex. 18.)[1]

Winship was absent again on April 2 through 4, 2006, for a scheduled angiogram. Winship alleges that she received prior approval for the April 2 absence, but that she did not realize that her doctors would require her to stay off her feet for 24 hours after the procedure. According to Winship, on the morning of April 3 she called Cylkowski and told her that she had been instructed by her doctor to stay home that day, but offered to come to work if her absence would result in termination. Winship alleges that Cylkowski responded that she should stay home. Winship stayed home on April 3 and part of the day on April 4. The next day, on April 5, 2006, Winship was suspended without pay for

---

[1] Winship filed a grievance with her Union as a result of the February 2006 reprimand, which was denied in a memorandum issued March 21, 2006. (Hohbach Aff., Ex. 20.) The memo stated that the reprimand was the result of plaintiff's excessive absenteeism, noting that 86% of the flex time used in 2005 was unplanned and/or unpaid.

one day.  The notice of suspension stated that "[t]his action is taken as a result of your unexcused absence on April 3, 2006 and partial day on April 4, 2006."  (Hohbach Aff. Ex. 25.)  The suspension referenced the February 2006 reprimand, stating that Winship had been put on notice that further unexcused absences would be considered unauthorized and would result in progressive disciplinary action.  Dakota County admits that Winship received prior approval for the April 2 procedure, but denies that Winship obtained approval for the April 3 or April 4 absences.

On April 7, 2006, Winship signed a FMLA leave request form.  Dakota County granted the request, and Winship began FMLA leave on April 20, 2006.[2]  Winship alleges that she did not seek FMLA leave for the prior absences discussed above because she did not realize that FMLA leave applied to periodic, short-term absences.  Winship believed that FMLA leave was available only for longer, continuous absences.  She also notes that she was under considerable stress and was not emotionally stable during this time.

Dakota County has posted in the workplace a Notice of Rights under the FMLA, and also makes its FMLA plan available on its website.  The Dakota County FMLA Plan states that FMLA leave can be taken either as continuous leave or intermittent leave. Winship's first request for FMLA leave – submitted in early 2004 – stated that she had read and understood the FMLA leave provisions.  Winship also worked on the union

---

[2] Winship exhausted her FMLA leave, but remained on short-term, long-term, and Social Security disability leave until her termination from Dakota County during the week of April 21, 2008.  Winship does not allege that she was terminated in retaliation for exercising her rights under the FMLA.

bargaining committee and helped negotiate a labor agreement on behalf of union employees from May 2005 until March 2006, which included specific provisions under the FMLA such as provisions regarding employee eligibility for FMLA leave.

Winship brought this action against Dakota County on December 6, 2006, alleging that Dakota County violated the FMLA by interfering with her right to take leave under the FMLA.[3] Specifically, Winship alleges Dakota County interfered by (1) giving her a lower annual performance evaluation based on her absences; (2) formally reprimanding her on February 27, 2006, for failure to report to work and excessive absenteeism; (3) suspending her on April 5, 2006 for one day without pay despite her request for approved absence for a scheduled angiogram; and (4) failing to notify her of the right to intermittent leave under the FMLA. Dakota County removed this action to federal court and filed the instant motion for summary judgment.

## ANALYSIS

**I.     STANDARD OF REVIEW**

Summary judgment is appropriate in the absence of any genuine issue of material fact and when the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

---

[3] Winship initially asserted a cause of action under the Minnesota Human Rights Act in Count II of her Complaint, but has since withdrawn that claim. Winship's counsel also confirmed during oral argument that she is not asserting a claim for FMLA retaliation against Dakota County.

(1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.   WINSHIP'S FMLA INTERFERENCE CLAIM

The FMLA entitles eligible employees[4] to take up to twelve weeks of leave for "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). An employee who takes FMLA leave generally has the right, upon returning from leave, to be reinstated either to the position that she occupied when she went on leave or to an equivalent position. 29 U.S.C. § 2614(a)(1). The FMLA prohibits employers from interfering with, restraining or denying the exercise of an employee's FMLA rights.[5] 29 U.S.C. § 2615(a)(1); *Throneberry v. McGehee Desha County Hosp.*, 403 F.3d 972, 977 (8th Cir. 2005).

To prevail on an interference claim, the plaintiff must show that he or she was entitled to FMLA leave and that the defendant unlawfully interfered with or denied that leave. *See Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1050 (8th Cir. 2006). An

---

[4] In order to be eligible for FMLA benefits, an employee must (1) have been employed by the employer from whom leave is requested for at least 12 months from the date the leave commences; and (2) have provided the employer with at least 1250 hours of service during the previous 12-month period. 29 U.S.C. § 2611(2)(A). Dakota County does not dispute that Winship was eligible for FMLA benefits throughout the relevant time period.

[5] The FMLA also allows for retaliation claims, in which the employee alleges that the employer discriminated against her in retaliation for the exercise of FMLA rights. 29 U.S.C. § 2615(a)(2). As noted above, Winship has not alleged retaliation in this action.

employee is entitled to FMLA leave where he suffers a "serious health condition," defined as an illness, injury, impairment, or physical or mental condition that involves (1) "inpatient care (*i.e.*, an overnight stay) in a hospital, hospice, or residential medical care facility," or (2) "continuing treatment by a health care provider." 29 C.F.R. § 825.114(a). The federal regulations define "continuing treatment" to include the following:

> (i) A period of incapacity (i.e., inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:
>
> (A) Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or
>
> (B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

29 C.F.R. § 825.114(a)(2). "Where absences are not attributable to a 'serious health condition,' . . . FMLA is not implicated and does not protect an employee against disciplinary action based upon such absences." *Rankin v. Seagate Tech., Inc.*, 246 F.3d 1145, 1147 (8th Cir. 2001).

Interference includes "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave. It would also include manipulation by a covered employer to avoid responsibilities under FMLA." 29 C.F.R. § 825.220(b); *Stallings*, 447 F.3d at 1050 ("An employer's action that deters an employee from participating in protected activities constitutes an 'interference' or 'restraint' of the

employee's exercise of his rights."). In addition, any violation of the FMLA or its regulations constitutes interference. 29 C.F.R. § 825.220(b).

The FMLA also requires employees to provide adequate notice to their employers of the need to take leave. 29 C.F.R. §§ 825.302-.303; *Carter v. Ford Motor Co.*, 121 F.3d 1146, 1148 (8th Cir. 1997). In situations where the need for leave unexpectedly arises, the employee is to give notice "as soon as practicable," but the employee "need not explicitly assert rights under the FMLA or even mention the FMLA." 29 C.F.R. § 825.303(a),(b); *Rask v. Fresenius Med. Care N. Am.*, 509 F.3d 466, 471 (8th Cir. 2007). Although employees need not invoke the FMLA by name, they must provide information to suggest that the health condition could be serious. *Woods v. DaimlerChrysler*, 409 F.3d 984, 990 (8th Cir. 2005) (plaintiff must provide employer with enough information to show that he may need FMLA leave). In evaluating whether adequate notice was given, the court can consider the totality of the circumstances, including whether the employer was aware the employee suffered from a serious health condition and whether the employee had previously requested FMLA leave. *See Spangler v. Fed. Home Loan Bank of Des Moines*, 278 F.3d 847, 852-53 (8th Cir. 2002).

### A.   **August 2005 Performance Review**

Winship first argues that Dakota County interfered with her right to exercise FMLA leave by giving her a lower rating in her August 2005 performance review than

she had received in the past.[6] Winship notes in particular that the review stated that her "unreliable attendance has created a problem with coverage and trust." (Hohbach Aff. Ex. 16 at 5.) However, Winship has not demonstrated that she was eligible for FMLA leave for a "serious health condition" between June 2004 and June 2005, the period covered by the August 2005 performance review. Indeed, Winship concedes that she did not request FMLA leave at any time during this period. Additionally, Winship's physician provided defendant with a letter in May 2005 stating that Winship was capable of performing all the essential elements of her job as a collections specialist. (Hohbach Aff. Ex. 15.) Further, while the August 2005 review referenced Winship's attendance issues, the review was otherwise largely positive, resulting in a merit increase and pay raise. The Court also notes that, in an earlier 2004 performance review completed just weeks after Winship returned from an extended period of FMLA leave, Winship had received the highest possible performance rating, which further undermines any causal connection between Winship's leave and her August 2005 review. (Hohbach Aff. Ex. 10.) As such, even assuming that Winship had been FMLA eligible for absences between June 2004 and June 2005, the Court finds insufficient evidence to allow a reasonable jury

---

[6] Winship also appears to argue that the October 6, 2004 written memorandum from Cylkowski, which noted that Winship had used all of her flex time and had none left for emergency situations, gives rise to an interference claim. However, Winship filed this action in December 2006, and the October 2004 memo is therefore outside the FMLA's two-year statute of limitations for non-willful FMLA violations. *See* 29 U.S.C. § 2617(c)(1); *Samuels v. Kan. City Mo. Sch. Dist.*, 437 F.3d 797, 803 (8th Cir. 2006). In addition, Winship alleged broadly that defendant harassed her in violation of the FMLA, but she has provided no supporting argument for that claim. Accordingly, the Court grants defendant's motion for summary judgment as to that claim without further discussion.

to conclude that the August 2005 review would have deterred or dissuaded Winship from exercising her right to FMLA leave.

### B.  February 2006 Reprimand

Winship next argues that Dakota County interfered with her FMLA rights when it issued her a written reprimand in February 2006 for excessive absenteeism without prior approval.  Winship notes that she had been hospitalized for five days in November 2005 following her ischemia and colitis, and that she received permission from defendant to remain out of the office for ten days.  Winship argues that the February 2006 reprimand was based in part on her *excused* absences in November 2005, and that the reprimand therefore deterred her from exercising her protected right to medical leave.  However, the written reprimand was expressly limited to Winship's absences in January and February 2006, based on a finding that Winship had been absent in those two months for 132.75 out of 320 hours, or 58% of her full time work schedule.  (Hohbach Aff. Ex. 18.)  The reprimand states that Winship had been repeatedly absent without prior approval during this time, leaving her work unit short staffed, and warns that future absences would be considered unexcused unless Winship followed the required procedures for requesting leaves of absence.

Even viewing these facts in a light most favorable to Winship, the Court is not persuaded that the basis for the February 2006 reprimand was anything other than Winship's failure to seek prior approval for a substantial number of leaves of absence. While the record suggests that defendant may have been aware that Winship was having health-related issues during this time, the reprimand is limited to Winship's repeated

absences without prior approval. Indeed, the reprimand notifies Winship that she must properly request leave in order to avoid further unexcused absences. As such, the Court finds insufficient evidence in the record to allow a reasonable jury to conclude that the February 2006 reprimand would have deterred or dissuaded Winship from exercising her FMLA rights.

### C.   One-Day Suspension

Winship also contends that her one-day suspension without pay on April 6, 2006, constitutes interference with her FMLA rights. Winship alleges that she sought and received advanced approval for a leave of absence on April 2, 2006, for a scheduled angiogram. On the day of the procedure, Winship's doctor informed her that she would be required to stay off her feet for 24 hours. Winship alleges that she called Cylkowski on the morning of April 3 to tell her about the doctor's orders, and offered to come to work anyway if her absence would result in termination. According to Winship, Cylkowski told her that she should stay home, and Winship remained home on April 3 and part of the day on April 4. Dakota County contends that Winship's absence on April 3 and 4 were not authorized in advance, and thus resulted in her suspension.[7]

Viewing these facts in a light most favorable to Winship, the Court finds that a genuine issue of material fact exists as to whether Winship's suspension without pay on

---

[7] Dakota County also argues that Winship failed to exhaust administrative remedies with respect to the April 6 suspension, barring her FMLA claim. However, the FMLA does not require that a plaintiff first exhaust administrative remedies before proceeding to court. *Cruz-Packer v. Dist. of Columbia*, 539 F. Supp. 2d 181, 190 (D.D.C. 2008); *Krohn v. Forsting*, 11 F. Supp. 2d 1082, 1085 (E.D. Mo. 1998).

April 6, 2006, constitutes interference under the FMLA. If Winship did in fact request and receive permission for a leave of absence on April 3 and April 4, then a jury may reasonably conclude that Dakota County's decision to suspend Winship was based not on her failure to properly seek approval for leave, but on the exercise of her right to FMLA protected leave.[8] Moreover, the record suggests that defendant was generally aware of Winship's colitis and ischemia, based on her hospitalization in November 2005, her continuing health problems in early 2006, and her need for an angiogram in April 2006. Thus, even if Winship did not obtain advanced authorization for leave on April 3 and 4, whether Winship provided sufficient notice to Dakota County that she needed additional leave related to her colitis presents a fact issue for the jury. *See Browning v. Liberty Mut. Ins. Co.*, 178 F.3d 1043, 1049 (8th Cir. 1999) (stating that "the employer's duties are triggered when the employee provides enough information to put the employer on notice that the employee may be in need of FMLA leave"); *see also Spangler*, 278 F.3d at 852 (finding that evidence that defendant was generally aware of plaintiff's mental condition put defendant on notice that plaintiff needed FMLA leave by stating she would be absent for "depression again"). The jury may further find that Dakota County's suspension of Winship, even after Winship attempted to comply with the leave authorization procedures outlined in the February 2006 reprimand, dissuaded Winship from exercising her right to

---

[8] The Court notes that defendant has not challenged Winship's eligibility for FMLA leave for the April 2 angiogram procedure and the resulting recovery time. The record suggests that Winship was incapacitated for three consecutive days in November 2005, followed by treatment on multiple occasions by a health care provider in 2006 for her colitis. (*See* Winship Decl. ¶¶ 11-13, 24.) As such, Winship appears to have suffered from a "serious health condition" involving "continuing treatment" by a health care provider. *See* 29 C.F.R. § 825.114(a)(2).

leave under the FMLA. Thus, although the fact that Winship ultimately exercised her FMLA rights on April 7, 2006, just days after the suspension, may weaken Winship's interference claim, the Court finds that Winship has alleged a sufficient factual basis to defeat summary judgment with respect to the April 6, 2007 suspension.

### D.     Failure to Notify

Finally, Winship contends that Dakota County failed to notify her of her right to take intermittent leave under the FMLA during meetings in January and February 2006, and that this failure to notify constitutes interference. An employer's failure to advise an employee of FMLA rights may constitute interference if the employee establishes that the failure to advise rendered her unable to exercise her FMLA rights in a meaningful way and thereby caused injury. *See Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 143 (3d Cir. 2004). According to Winship, she had discussions with Dakota County managers in January and February 2006 regarding her repeated absenteeism, and Dakota County failed to inform her of her right to take intermittent FMLA leave at that time. Winship alleges she was under the mistaken impression that she could take FMLA leave only for longer, continuous periods of time.

The Court finds insufficient evidence supporting Winship's claim that Dakota County's failure to advise her of her FMLA rights in January and February 2006 constitutes interference. Rather, the record demonstrates that Winship possessed general information regarding her FMLA rights, including her right to intermittent leave. Winship was provided with notice of her FMLA leave rights in the Dakota County employee handbook, which contains the County's FMLA plan and specifically references

an employee's right to take intermittent leave under the FMLA. (Hohbach Aff. Ex. 5.) Winship was a member of the union contract negotiating team, which was responsible for renewing a contract containing FMLA provisions. (Hohbach Aff. Ex. 9 at 2.) Further, Winship applied for and was granted FMLA leave in March 2004, and indicated at that time that she had read the FMLA handbook and understood the relevant FMLA provisions. (Hohbach Aff. Ex. 4.) The FMLA leave form itself contains a section requiring the employee to specify whether leave is taken on an intermittent basis. (*Id.*) The record shows that Winship in fact exercised her FMLA leave in 2004 on an intermittent basis from February 18 until June 10, 2004. (Martin Aff. ¶ 4.) Winship's FMLA request form dated April 7, 2006 also indicates that Winship intended to take intermittent FMLA leave at that time. (Hohbach Aff. Ex. 22.)

Finally, Winship has not demonstrated that she in fact requested intermittent FMLA leave from Dakota County during January or February 2006. *See Brown v. E. Maine Med. Ctr.*, 514 F. Supp. 2d 104, 112 (D. Me. 2007) (finding that an employer did not have a duty to inform employee of right to intermittent FMLA leave where employee never told employer she was seeking leave for short durations). Indeed, as discussed above, the basis for the February 2006 reprimand was Winship's failure to seek proper authorization for leaves of absence during that time period. In sum, even viewing these facts in a light most favorable to Winship, the Court finds that a reasonable jury could not conclude that Dakota County's failure to advise her of the right to take intermittent leave during meetings in January and February 2006 deterred or dissuaded Winship from exercising her FMLA rights. The Court therefore grants Dakota County's

motion for summary judgment with respect to Winship's claim that its failure to advise her of her intermittent FMLA rights constitutes interference.

This case will be placed on the Court's next available trial calendar.

## ORDER

Based on the foregoing, all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that Defendant Dakota County's Motion for Summary Judgment [Docket No. 15] is **GRANTED in part** and **DENIED in part**, as follows:

1. The motion is **DENIED** as to Count I of Winship's Complaint, specifically as to Winship's claim that Dakota County interfered with her rights under the FMLA when it suspended her without pay on April 6, 2006.

2. The motion is **GRANTED** in all other respects.


DATED:   September 3, 2008
at Minneapolis, Minnesota.

                s/ John R. Tunheim
                 JOHN R. TUNHEIM
                United States District Judge